UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| J. I. B. a minor by his mother SHALONDA J. BULLOCK, | ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) )  No. 1:12-cv-00022-SEB-DML ) |
| MICHAEL J. ASTRUE Commissioner of the Social Security Administration, | ) ) ) ) |
| Defendant. | ) |

**ORDER**

J.I.B. ("Claimant"), a minor, by his mother, Shalonda J. Bullock ("Bullock"), seeks judicial review of a final decision by the Commissioner of the Social Security Administration ("Commissioner") denying his application for Supplemental Security Income ("SSI") under the Social Security Act (the "Act").  See 42 U.S.C. §§ 402(d). For the reasons detailed herein, the Commissioner's decision is AFFIRMED.

**I.      Factual Background**

Claimant was ten years old at the time of the decision of the Administrative Law Judge ("ALJ") to deny his application for SSI. Claimant applied for benefits based upon his history of asthma, obesity, depression, and learning disorder. Because the arguments in Claimant's brief are confined to the ALJ's decisions with regard to Claimant's asthma and depression, our factual recitation focuses on Plaintiff's history of these impairments.

**A.      Claimant's History of Asthma**

Claimant has a history of asthma for which he has been prescribed various medications, including Albuterol, Pulmicort, and Flovent. In general, the record reveals that Claimant has sought out medical treatment occasionally since 2007 for refills of his asthma medications or when cold symptoms have exacerbated his condition. The Claimant's mother testified that Claimant has not had an asthma attack since he was a baby. R. at 37.

Claimant sought treatment in January 2007 complaining of a cough, congestion, and wheezing. R. at 285. At that time, Claimant was assessed as having an upper respiratory infection. R. at 287. Claimant's mother was also counseled regarding asthma, causes, triggers, and symptoms. Id.

In May 2008, Claimant sought a refill for his asthma medications, which he had been out of for three weeks. R. at 289. Since running out of his medications, the Claimant reported waking with shortness of breath and coughing at least once per week. Id.

Claimant again sought treatment in August 2008 for a cold, cough, and congestion. R. at 282. During that appointment, Claimant's mother indicated that Claimant had been using his Albuterol approximately twice per week but that this had increased to two times per day since the onset of Claimant's cold. Id.

Claimant again sought treatment in March 2009 complaining of irregular breathing and a cold. R. at 278. At that time, Claimant was not using his asthma medications, despite their prescription. Id. Claimant's physician noted that his asthma was moderate and persistent and advised Claimant to restart his use of Albuterol or Flovent as directed. R. at 279.

Claimant sought treatment in October 2010 for his asthma and complained of wheezing. R. at 265-66. The notes from that appointment indicate that the Claimant stated that he had run out of his asthma medications and that he used his albuterol "just a couple times a week." R. at

266. The Claimant's mother apparently indicated that Claimant typically used asthma medication "once every other day." Id.

### B. Claimant's History of Depression

Claimant's history of mental health issues began in July 2010 when Claimant was assessed by the Gallahue mental health school-based program. R. at 247-49. At that time, Claimant and his mother reported that Claimant was experiencing depression, mood disorder, behavior problems, and bereavement and stated that symptoms had begun in the past year, precipitated by the incarceration of Claimant's mother. Id. The record reveals that Claimant had indicated to his teacher and his mother that he wanted to kill himself and that he suffered from "initial insomnia," "decreased functioning at home and school," obesity, poor concentration, feeling bullied by his cousin, feelings of worthlessness and helplessness. R. at 227-28; 247-49. Claimant testified that he ate large meals several times a day as a way to deal with his depression. R. at 45-46. Around this period, Claimant's family physician diagnosed Claimant with Major Depression and assessed Claimant's GAF as 48.[1] R. at 231.

Throughout August and September of 2010, Claimant continued to attend therapy sessions where he reported that his original symptoms continued in varying degrees. R. at 232-44. At Claimant's October 1, 2010 therapy session, Claimant reported suicidal ideation in the preceding week but denied it at the time of his appointment. R. at 233.

In October 2010, Claimant's school teachers filled out a form from the Disability Determination Bureau regarding Claimant's functioning. R. at 172-180. The teachers reported that Claimant had "slight" and "obvious" problems (as opposed to "no" problems, "serious" problems, or "very serious" problems) in acquiring and using information, attending and

---

[1] Global Assessment of Functionality scores are measures of both the severity of symptoms and functional level. Denton v. Astrue, 596 F.3d 419, 425 (7th Cir. 2010)(citing Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 32-34 (Text Revision, 4th ed. 2000)).

completing tasks, interacting and relating with others, and caring for himself. They reported that Claimant had no observed problems with moving or manipulating problems. R. at 177. The only "serious" problem observed by Claimant's teachers was in the area of "focusing long enough to finish assigned activity or task." R. at 175.

Throughout the rest of 2010 and 2011, Claimant continued to receive therapy for his depression and was assessed as having GAF scores of 48, 50, and 52. R. at 295, 297, 371, 376, 380, 382, 389, 394, 399, 404, 420, 430. The medical records from this period show that Claimant was assessed by a state agency physician in December 2010. That physician indicated that Claimant's impairments were severe but did not meet, medically equal, or functional equal a listing. R. at 316. That physician also indicated that Claimant was credible. R. at 321. At an April 2011 therapy session, Claimant reported feeling more fatigued, which the therapist used as an opportunity to discuss increasing physical activity. R. at 371.

At a July 2011 therapy session, the therapist reported that Claimant might need to take medicine to control his anger. R. at 409. At that time, Claimant stated that he had not had thoughts of suicide since 2010. Id. Plaintiff was prescribed Wellbutrin, an antidepressant medication in July 2010. R. at 412, 424.

## II. Applicable Law

An individual under the age of eighteen is eligible for disability benefits under the SSI program of the Act if he "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). Notwithstanding the above, no individual under the age of 18 who engages in substantial gainful activity may be considered to be disabled. To

establish disability, the plaintiff is required to present medical evidence of a physical or mental impairment that results from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques.  Id. § 1382(c)(a)(3)(D).  In determining whether impairments are disabling, the combined effect of all a child's impairments must be considered, without regard to whether any single impairment alone is of disabling severity.  Id. § 1382c(a)(3)(G).

By regulation, the Social Security Administration ("SSA") has determined that satisfaction of one of the Listings of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, Part B, fulfills the statutory requirement that a child's impairment or combination of impairments "results in marked and severe functional limitations."  The Listing of Impairments, Part B, is a compilation of medical conditions, divided into fourteen major body systems, that the SSA has pre-determined are disabling in children.  20 C.F.R. § 416.925.  In general, each listed condition is defined by two sets of criteria: diagnostic findings that substantiate the existence of a listed condition and sets of related functional limitations that substantiate the condition's disabling severity.  Id.  A child's impairment or group of impairments can satisfy a listed condition in any of three ways: by meeting all the listed criteria for the condition, 20 C.F.R. § 416.925(c)(3); by medically equaling the criteria, id. § 416.925(c)(5); or by functionally equaling the criteria, id. § 416.926a(a).

A child's impairment *meets* a listed condition only when it satisfies all of the criteria of the listing.  20 C.F.R. § 416.025(c)(3) and (d).  A child's impairment *medically equals* a listed condition when it is at least equal in severity and duration to the criteria of a listed condition.  Id. § 416.926(a).  Medical equivalence will be found when: (1) the child's impairment, though listed, is lacking one or more of the medical or severity criteria, but other findings related to the

impairment are of at least equal medical significance to the listed criteria, id. § 416.926(b)(1); (2) the child's impairment is not a listed condition but the impairment's medical and severity findings are of at least equal medical significance to a closely analogous listed condition, id. § 416.926(b)(2); or (3) the child has a combination of impairments, no one of which equals a listed condition, but the impairments' medical and severity findings are of at least equal medical significance to a listed condition, id. § 416.926(b)(3).

A child's impairment or combination of impairments will *functionally equal* a listed condition when it is of listing-level severity, meaning that it results in a "marked" limitation in two domains of functioning or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(a). The domains of functioning are: (1) acquiring and using information, (2) attending to and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for self, and (6) health and physical well-being, id. § 416.926a(b)(1), and SSA has defined constituent activities within each domain and their normal levels of performance at different age groups, id. § 416.926a(g)-(l). In general, a "marked" limitation exists when a child's impairment or combination of impairments "interferes seriously with [his] ability to independently initiate, sustain, or complete activities" within a particular domain. It is a limitation that is "more than moderate" but "less than extreme," and is the level of functioning that is expected with scores that are more than two, but less than three, standard deviations below the mean on standardized tests. Id. § 416.926a(e)(2). An "extreme" limitation is one that interferes "very seriously" with a child's ability to perform activities within a domain. It is "more than marked," and is the level of functioning that is expected with scores at least three standard deviations below the mean on standardized testing. Id. § 416.926a(e)(3).

SSA has established a three-step sequential process for evaluating child-disability claims. 20 C.F.R. § 416.924. If disability eligibility can be determined at any step in the sequence, an application will not be reviewed further. Id. § 416.924(a). At the first step, if the child is engaged in substantial gainful activity, *i.e.*, is earning money, then he is not disabled. Id. § 417.924(b). At the second step, if the child's impairments are not severe, then he is not disabled. A severe impairment or combination of impairments is one that causes "more than minimal functional limitations." Id. § 416.924(c). Third, the child's impairments, either singly or in combination, must satisfy the criteria of at least one of the conditions included in the Listing of Impairments. Id. § 416.924(d). If a child's impairments pass all three steps, and satisfies the duration requirement, then he is deemed disabled.

An application for benefits, together with any evidence submitted by the applicant and obtained by the agency, undergoes initial review by a disability examiner and a physician or other appropriate medical specialist. If the application is denied, the applicant may request reconsideration review, which is conducted by different disability and medical experts. If denied again, the applicant may request a hearing before an administrative law judge ("ALJ").[1] An applicant who is dissatisfied with the decision of the ALJ may request SSA's national Appeals Council to review the decision. If the Appeals Council either declines to review or affirms the decision, then the claimant may file an action in district court for judicial review. 42 U.S.C. § 405(g). If the Appeals Council declines to review a decision, then the decision of the ALJ becomes the final decision of the Commissioner for judicial review.

---

[1] Initial and reconsideration reviews in Indiana are performed by an agency of the state government—the Disability Determination Bureau, a division of the Indiana Family and Social Services Administration—under arrangement with the Social Security Administration. 20 C.F.R. Part 404, Subpart Q (§ 404.1601 et seq.). Hearings before ALJs and subsequent proceedings are conducted by personnel of the federal SSA.

The task a court faces in a case such as this is not to attempt a *de novo* determination of the plaintiff's entitlement to benefits, but to decide if the Commissioner's decision is supported by substantial evidence and otherwise is free of legal error. Kendrick v. Shalala, 998 F.2d 455, 458 (7th Cir. 1993). "Substantial evidence" has been defined as "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison v. NLRB, 305 U.S. 197, 229 (1938)).

### III. The ALJ's Decision

At Step One of the sequential analysis, the ALJ determined that Claimant had not engaged in substantial gainful activity since September 23, 2010, the application date. At Step Two, the ALJ determined that the claimant had the following severe impairments: asthma; obesity; learning disorder; and depression. R. at 14. At Step Three, the ALJ determined that Claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments. Specifically, the ALJ considered the following Listings: 103.3 (Asthma); 112.04 (Mood Disorders); 112.02 (Organic Mental Disorders).

Also at Step Three, the ALJ determined that the Claimant did not have an impairment or combination of impairments that functionally equaled the severity of the listings. In coming to this conclusion, the ALJ considered Claimant's symptoms in terms of how they affected his functioning in the six domains described above. The ALJ determined that Claimant had "less than marked" limitations in terms of acquiring and using information, attending and completing tasks, interacting and relating with others, and health and physical well-being. The ALJ determined that Claimant had "no limitation" in terms of moving about and manipulating objects or caring for himself.

In light of these findings, the ALJ determined that Claimant was not disabled as defined in the Social Security Act and his application for supplemental security income was denied.

## IV. Discussion

Claimant has asserted three arguments on the basis of which he insists remand is necessary: (A) The ALJ's conclusions that Claimant's impairments did not meet, medically equal, or functionally equal Listings 103.03 or 112.04 are not supported by substantial evidence; (B) The ALJ's failed to summon a medical advisor to testify regarding Claimant's impairments in terms of Listings 103.3 or 112.04; and (C) The ALJ's adverse credibility determination was patently erroneous. We discuss each of these arguments below.

### A. The ALJ's Determination Regarding Whether Claimant's Impairments Met or Functionally Equaled Listings 103.03 or 112.04

As noted above, Claimant maintains that substantial evidence does not support the ALJ's conclusions that his impairments do not meet or functionally equal Listings 103.03 (Asthma) or 112.04. We discuss the evidence in terms of each of these listings below.

#### 1. Listing 103.03 Asthma

Listing 103.03(c)(2) provides:

> Persistent low-grade wheezing between acute attacks or absence of extended symptom-free periods requiring daytime and nocturnal use of sympathomimetic bronchodilators with … (2) Short courses of corticosteroids that average more than 5 days per month for at least 3 months during a 12-month period.

20 C.F.R. Part 404, Appendix 1. The ALJ concluded that there was no evidence of (1) asthma attacks; (2) persistent low-grade wheezing between attacks; or (3) an absence of extended symptom free periods, as required to meet this Listing. R. at 14. Claimant argues that substantial evidence does not support this conclusion because the ALJ ignored evidence of a repeated diagnosis of asthma involving wheezing and his continuous prescriptions for medications,

including Pulmicort, Orapred, and Flovent.  Pl.'s Mem. At 14 (citing R. 265-66, 269, 272, 278-79, 282-83, 285-91).

However, as the Commissioner points out, the fact that Claimant can point to *some* evidence of wheezing or prescribed steroids does not mean that the ALJ's conclusion that this wheezing was not "persistent" or that there was no absence of symptom-free periods was unsupported by the evidence.  The totality of the evidence cited by Claimant shows that he sought treatment in January 2007, May 2008, August 2008, May 2009, and October 2010.[2]  The notes from these appointments reveal that Claimant complained of coughing, congestion, and wheezing but only when he also reported suffering from a cold or when he had run out of his medications.  R. 265-66, 269, 272, 278-79, 282-83, 285-91.  Indeed, when Claimant sought a refill for his asthma medications in May 2008, it is noted that he had been without his medication for three weeks and only then reported waking with shortness of breath and coughing at least once a week.  R. at 289.  In the August 2008 appointment, Claimant's mother indicated that Claimant typically used his albuterol approximately twice per week but that this had increased to two times per day since the onset of Claimant's cold.  R. at 282.

In light of this evidence, we find that the ALJ's conclusion that there was no evidence of the type of "persistent low-grade wheezing" or "absence of extended symptom-free periods requiring daytime and nocturnal use of sympathomimetic bronchodilators" required to meet Listing 103.03(C) was supported by substantial evidence.  Furthermore, the ALJ acknowledged Claimant's treatment notes from January 2007 through October 2010 and noted that they showed

---

[2] In his Reply brief, Claimant points out that Claimant's mother testified at the administrative hearing that Claimant sounds like he is wheezing every day and that he takes his Albuterol and Flovent daily.  However, "It is improper for a party to raise new arguments in a reply because it does not give an adversary adequate opportunity to respond." Citizens Against Ruining the Env't v. EPA, 535 F.3d 670, 675 (7th Cir. 2008).  Moreover, this single piece of evidence supporting Claimant's position of his persistent wheezing is not enough to overcome the lack of a medical record evidencing that condition.

"that the claimant is prescribed a daily dose of Flovent and an Albuterol inhaler as needed, with no changes in prescription and although he has required oral steroids on a couple of occasions, physical exams revealed no significant problems with rales, rhonchi, or wheezes." R. at 17. Thus, the ALJ cannot be said to have "ignored" Claimant's evidence of treatment for asthma. Accordingly, we affirm the ALJ's ruling in this regard.

    2.    <u>Listing 112.04 (Mood Disorders)</u>

Listing 112.04 provides:

Characterized by a disturbance of mood (referring to a prolonged emotion that colors the whole psychic life, generally involving either depression or elation), accompanied by a full or partial manic or depressive syndrome.

The required level of severity for these disorders is met when the requirements in <u>both</u> A and B are satisfied.

A. Medically documented persistence, either continuous or intermittent, of <u>one</u> of the following:

1. Major depressive syndrome, characterized by <u>at least five</u> of the following, which must include either depressed or irritable mood or markedly diminished interest or pleasure: a. Depressed or irritable mood; or b. Markedly diminished interest or pleasure in almost all activities; or c. Appetite or weight increase or decrease, or failure to make expected weight gains; or d. Sleep disturbance; or e. Psychomotor agitation or retardation; or f. Fatigue or loss of energy; or g. Feelings of worthlessness or guilt; or h. Difficulty thinking or concentrating; or i. Suicidal thoughts or acts; or j. Hallucinations, delusions, or paranoid thinking;

<u>OR</u>

2. Manic syndrome, characterized by elevated, expansive, or irritable mood, and at least three of the following: a. Increased activity or psychomotor agitation; or b. Increased talkativeness or pressure of speech; or c. Flight of ideas or subjectively experienced racing thoughts; or d. Inflated self-esteem or grandiosity; or e. Decreased need for sleep; or f. Easy distractibility; or g. Involvement in activities that have a high potential of painful consequences which are not recognized; or h. Hallucinations, delusions, or paranoid thinking;

<u>OR</u>

> 3. Bipolar or cyclothymic syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently or most recently characterized by the full or partial symptomatic picture of either or both syndromes);
>
> AND
>
> B. For older infants and toddlers (age 1 to attainment of age 3), resulting in at least one of the appropriate age-group criteria in paragraph B1 of 112.02; or, for children (age 3 to attainment of age 18), resulting in at least two of the appropriate age-group criteria in paragraph B2 of 112.02.

20 C.F.R. Part 404, Appendix 1 (emphasis added).[3]

In determining that Claimant's symptoms did not meet the requirements of this Listing, the ALJ stated:

> The claimant has demonstrated a depressed or irritable mood, had an increase of weight, some feelings of worthlessness, and one suicidal thought. However, because the requirements in Subpart A are not met, it is not necessary to further evaluate Paragraph B. Therefore, his depression does not meet or medically equal the requirements of Listing 112.04.

R. at 15. Thus, the ALJ found that there was at least some evidence that Claimant met four of the characteristics of Subpart A. Because the Listing states that "at least five" of such characteristics are required, the ALJ found that Claimant's impairment did not meet the criteria of the Listing.

Claimant argues that the ALJ's conclusion is not supported by substantial evidence because the ALJ ignored evidence from July 2010 through July 2011 during which Claimant reported symptoms of sleep disturbance and fatigue or loss of energy. Pl's Mem. At 15 (citing R. 227, 233, 247-49, 269, 256, 371, 409). Claimant maintains that this evidence establishes

---

[3] B2 of Listing 112.02 provides the following age group criteria: (a) Marked impairment in age-appropriate cognitive/communicative function, documented by medical findings; (b) Marked impairment in age-appropriate social functioning, documented by history and medical findings; (c) Marked impairment in age-appropriate personal functioning, documented by history and medical findings; (d) Marked difficulties in maintaining concentration, persistence, or pace. 20 C.F.R. Part 404, Appendix 1.

Subpart A of Listing 112.04 and that Claimant also meets the criteria of SubPart B because Claimant had repeated GAF assessments of 48-50, which evidence marked impairment in age-appropriate social functioning and marked difficulties in maintaining concentration, persistence, or pace.  Pl.'s Mem. At 15 (citing 249, 231, 297, 371 389, 404, 420, 430).

We disagree with Claimant's assertion that the ALJ's conclusion was not supported by substantial evidence.  Claimant points to only one instance in which he reported any difficulty sleeping.  Specifically, he cites to pages 227, 247, and 409 of the record, all of which are referring to Claimant's complaint of "initial insomnia" when he first sought treatment for depression in July 2010.  The evidence of Claimant's fatigue is likewise extremely thin.  There is a single mention of the fact that Claimant felt "more tired" in April 2011 as an apparent result of "certain friendships."  R. at 371.  The therapist then stated that she explained that fatigue can be a symptom of depression and that healthy choices, including physical activity may help fatigue experienced by Claimant in the future.  There is nothing else in the record to support Claimant's claim that sleep disturbances or fatigue were continuous or even intermittent characteristics of his major depression and we find no error in the ALJ's determination that Claimant's major depression did not meet the requirements of Subpart A.[4]

    B.       The ALJ's Failure to Summon a Medical Expert

---

[4] The ALJ did not make any determination with regard to whether Claimant's symptoms satisfied the criterion for Subpart B.  However, we note that the only evidence Claimant provides in support of his argument that these criterion are met are his GAF scores.  As the Seventh Circuit has explained:

> GAF scores . . . are "useful for planning treatment," and are measures of both severity of symptoms and functional level.  Because the "final GAF rating always reflects the worse of the two," the score does not reflect the clinician's opinion of functional capacity.  Accordingly, "nowhere do the Social Security regulations or case law require an ALJ to determine the extent of an individual's disability based entirely on his GAF score."

Denton, 596 F.3d at 425.  Thus, while we (like the ALJ) do not pass judgment on whether Claimant's symptoms meet the criterion for Subpart B of Listing 112.04, we note the lack of evidence in support of this argument.

Claimant also argues that the ALJ's failure to summon a medical advisor to testify whether Claimant's impairments met Listings 103.03 and 112.04 constitutes reversible error. Pl.'s Mem. At 18-19.  In support, Claimant cites to Barnett v. Barnhart, 381 F.3d 664, 670 (7th Cir. 2004).  However, the Barnett decision does not stand for the proposition that Claimant appears to be asserting – that a medical advisor must be summoned to testify in all cases, including those in which the record medical evidence provides a sufficient basis for the ALJ's decision.  The decision to seek the opinion of additional medical experts is discretionary.  See 20 C.F.R. § 416.927(e)(2)(iii).

The ALJ determined that Claimant's symptoms did not meet the requirements of Listings 103.3 and 112.04 based on the medical evidence of record as discussed above, as well as the opinions of state agency consultants who opined that Claimant's impairments were severe but did not meet or functionally equal the requirements of any Listing.  R. at 17 (citing to R. at 316-321; 337-342).  The ALJ is entitled to rely on the opinion of such medical experts.  Scheck v. Barnhart, 357 F.3d 697, 700 (7th Cir. 2004).  In light of this evidence, the ALJ's determination that Claimant's impairment did not meet the requirements of Listings 103.03 and 112.04 is supported by substantial evidence and the ALJ was not required to summon a medical advisor on the matter.

### C. The ALJ's Credibility Finding

Finally, Claimant argues that the ALJ's credibility determination is reversible error because it is contrary to Social Security Ruling 96-7p ("SSR 96-7p").  However, Claimant's argument is largely undeveloped.  Claimant does not specifically identify any of the seven SSR 96-7p factors that the ALJ allegedly ignored.  Instead, he falls back on the argument, already rejected above, that the ALJ ignored evidence of Claimant's disability.

With regard to Claimant's asthma, the ALJ based his credibility determination on evidence within the record showing that Claimant's prescriptions for asthma medications had remained unchanged for several years, his physical examinations revealed no significant problems, and that his daily activities establish that his condition is not as significantly limited as alleged. R. at 17. The ALJ's credibility determination with regard to Claimant's depression is based on evidence within the record that Claimant's "fine and motor skills, his sensory and communication skills and cognitive, social and emotional skills were not affected by mental health impairment" and that "claimant's ability to complete tasks was slightly affected by mental impairment." R. at 17. In light of the ALJ's consideration of this evidence, we find that the ALJ's credibility determination was not patently erroneous and, thus, affirm the ALJ's findings.

### V.     Conclusion

For the reasons detailed herein, we **AFFIRM** the decision of the Commissioner.

IT IS SO ORDERED.


Date:   _____03/29/2013_____

_____
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Patrick Harold Mulvany
patrick@mulvanylaw.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov